UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 JUL -5 PM 4: 42

DISTRICT COURT
OF ALABAMA

| | | |
|---|---|---|
| CLYDE COLLINS PEARSON, III, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No.: CV-00-B-2371-NE** |
| INTERNET WIRE INC., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

ENTERED

JUL 5 2001

## MEMORANDUM OPINION

Currently before the court are Defendant Comtex News Network, Inc.'s Motion to Dismiss and Defendant Internet Wire, Inc.'s Motion to Dismiss. Plaintiff Clyde Collins Pearson, III ("plaintiff" or "Pearson") filed this putative class action against defendants Internet Wire Inc. ("Internet Wire"), Comtex News Network, Inc. ("Comtex"), and Emulex Corporation ("Emulex")[1] for compensatory and punitive damages allegedly incurred when plaintiff and the putative class sold their stock of Emulex Corporation. Internet Wire, Inc. is an Internet-based news wire service incorporated in the State of California that publishes financial press releases and other news pertaining to the financial markets, business, and technology. (Second Amended Complaint ("Compl.") at ¶¶ 5, 9-11; *see also* Defendant Internet Wire, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss ("Internet Wire's Br." at 1, 3.) Comtex is a news organization, incorporated and based in New York, which has partnered with Internet Wire, as

---

[1] On September 14, 2000, Pearson filed Plaintiff's Notice of Non-Suit Without Prejudice As to Emulex Corporation. By Order dated September 21, 2000, the court dismissed plaintiff's claims against Emulex without prejudice. The remaining two defendants will collectively be referred to throughout this Memorandum Opinion as "defendants."

1

33

well as other organizations, and republishes press releases which are submitted by Internet Wire's clients. (Compl. at ¶¶ 2, 10-11.)

Internet Wire moves to dismiss plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Comtex moves to dismiss plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motions are due to be granted.

## I.  BACKGROUND

Emulex and Internet Wire were involved in a contractual/business relationship, which authorized Internet Wire to act as an agent of Emulex in the issuance/dissemination of press releases regarding Emulex. (*See* Compl. at ¶ 10.) On August 25, 2000, Internet Wire and Comtex distributed a press release that had purportedly been submitted to Internet Wire by a representative of Emulex, stating that Emulex's financial statements for the "fourth quarter" were to be restated.[1] (*Id.* at ¶ 9.) The title of the press release also stated that Emulex was under investigation by the Securities Exchange Commission and that Emulex's Chief Executive Officer had resigned. (*Id.*) Once the Emulex press release became public, the price of Emulex stock began to decline, and plaintiff decided to sell the 2,000 shares of Emulex stock that he owned. (*Id.* at ¶¶ 9, 12-13.) The Emulex press release ultimately proved to be entirely fictitious, (*see*

---

[1]  "For purposes of ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must take the allegations of the complaint as true and construe them in a manner most favorable to the plaintiff." *Toole v. Brown & Williamson Tobacco Corp.,* 980 F. Supp. 419, 421 (N.D. Ala. 1997) (citing *Scheuer v. Rhodes*, 416 U S. 232, 236 (1974)); *accord In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1996).

*id.*), and was apparently authored and submitted by Mark Jakob ("Jakob"), a former Internet

Wire employee who had resigned from the company several weeks earlier.  (Internet Wire's Br.

at 3.)  As a result of selling his Emulex shares, plaintiff lost $120,000.  (Compl. at ¶¶ 12, 30.)

## II.   DISCUSSION OF INTERNET WIRE'S MOTION TO DISMISS

### A.   <u>Plaintiff's Allegations Against Internet Wire</u>

Plaintiff has not alleged that Internet Wire had any role in the authorship of the false

press release.  Instead, plaintiff alleges only that Internet Wire "issued and/or disseminated" the

Emulex press release, and failed to "verify its origination."  (*See* Compl. at ¶¶ 10-13.)  Based on

these allegations, plaintiff has asserted four Alabama state law claims against Internet Wire:

(1) Negligence/Gross Negligence, (2) Wanton Conduct, (3) Misrepresentation, and (4) Fraud.

(*Id.* at ¶¶ 15-29.)

### B.   <u>Standard of Review Under Rule 12(b)(6)</u>

The court is empowered to dismiss an action "for failure to state a claim upon which

relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Such a motion should be granted only if "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *accord Hishon v.*

*King & Spalding*, 467 U.S. 69, 73 (1984).  A complaint should be dismissed, however, if it is

clear that no relief could be granted even crediting plaintiffs' allegations of the facts.  *Shibata v.*

*Lim,* 133 F. Supp. 2d 1311, 1315 (M.D. Fla. 2000) (citing *Johannessen,* 76 F.3d at 349); *Toole,*

980 F. Supp. at 421.

**C.**     **The Securities Litigation Uniform Standards Act of 1998**

Internet Wire moves to dismiss plaintiff's Complaint on the ground that plaintiff's four

claims for relief (Negligence/Gross Negligence, Wanton Conduct, Misrepresentation, and

Fraud), which are pled as a class action, are preempted by the Securities Litigation Uniform

Standards Act of 1998 ("SLUSA"). (*See* Defendant Internet Wire Inc.'s Motion to Dismiss

("Internet Wire's Mot.") at ¶ 1; Internet Wire's Br. at 4-6; Defendant Internet Wire Inc.'s Reply

Memorandum in Support of Its Motion to Dismiss ("Internet Wire's Reply") at 1-5.) As set forth

below, plaintiff's allegations against Internet Wire as set out in his Complaint, even when

construed in the light most favorable to plaintiff, are barred by federal law, and additionally fail

to state a claim for relief under Alabama law.

In November 1998, Congress enacted SLUSA to preempt all class actions asserting state

law claims, whether brought in state or federal court, alleging "a misrepresentation or omission

of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C.

§78bb(f)(1)(A). SLUSA was adopted to prevent plaintiffs from circumventing the federal

pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("the

Reform Act") by filing securities class actions based on state law. *See In re Lutheran*

*Brotherhood Variable Insurance Products Co. Sales Practices Litigation,* 105 F. Supp. 2d 1037,

1039 (D. Minn. 2000) (citing H.R. Conf. Rep. No. 105-803 (Oct. 9, 1998)). Indeed, SLUSA

ensures that "securities class actions involving the purchase or sale of nationally traded

securities, based upon false or misleading statements, [are] brought exclusively in federal court

under federal law." *Lalondriz v. USA Networks, Inc.*, 54 F. Supp. 2d 352, 354 (S.D.N.Y. 1999)

(quoting *Malone v. Brincat*, 722 A. 2d 5 (Del. 1998)).

4

A securities class action is preempted under SLUSA if it meets four requirements: (1) it is based on state law; (2) it meets the definition of class action under the statute;[2] (3) it involves the "purchase or sale of a covered security," and (4) it alleges that the defendant made a "misrepresentation or omission of material fact in connection with" the purchase or sale of that security. *See* 15 U.S.C. § 78bb(f)(1)(A). A "covered security" under SLUSA includes, among other types of securities, those listed on the New York Stock Exchange, the American Stock Exchange and the NASDAQ Stock Market. *See* 15 U.S.C. §§ 78bb(F)(5)(E), 77r(b).

Plaintiff's class action is preempted because it satisfies these four requirements. Plaintiff's action is based exclusively on state law; it is pled as a qualifying class action under the statute,[3] and involves the sale of a "covered security."[4] Furthermore, plaintiff's action on its

---

[2]  SLUSA applies to class actions in which:

> (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those person or members of the prospective class . . . predominate over any questions affecting only individual persons or members; or

> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members. . . .

15 U.S.C. §78bb(f)(5)(B)(i)(I), (II).

[3]  Although plaintiff maintained during oral argument that his class action does not meet the definition of class action provided in §78bb(f)(5)(B)(i)(I), it is clear from the statute that the class action must only satisfy the definitions provided in either subsection (I) or (II). The court concludes that plaintiff's class action meets the definition provided in subsection (II), and is thus a "covered" class action under SLUSA.

[4]  Plaintiff does not dispute that Emulex Corporation is listed exclusively on the NASDAQ, and is therefore a covered security. (*See* Internet Wire's Br. at 4 n.3.)

face charges Internet Wire with having made a "misrepresentation" in connection with plaintiff's

purchase of Emulex shares. The gravamen of plaintiff's negligence-based claims and his fraud

claim is that Internet Wire "issued and/or disseminated" the "false press release" regarding

Emulex, upon which plaintiff relied in selling his shares. (*See* Compl. at ¶¶ 12-13, 15.)

Plaintiff maintains that this lawsuit should escape SLUSA preemption. (*See* Plaintiffs'

Response to Defendant, Internet Wire Incorporated's Motion to Dismiss ("Pl.'s Resp. to Internet

Wire") at 2-4.) Relying on *Burns v. Prudential Securities*, 116 F. Supp. 2d 917 (N.D. Ohio

2000) and *Green v. Ameritrade*, 120 F. Supp. 2d 795 (D. Neb. 2000), plaintiff argues that

SLUSA must be narrowly construed to preempt only state causes of action which precisely track

federal securities law under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of

1934, *i.e.* claims that require a plaintiff to plead scienter. (*See* Pl.'s Resp. to Internet Wire at 2-

4.) In effect, plaintiff seeks to add a fifth requirement to SLUSA's statutory scheme, a

requirement that state law claims must be akin to federal claims for "securities fraud" in order to

be preempted. However, plaintiff's argument is at odds with the plain language of SLUSA.

In interpreting a statute, the court is obligated to "look to its plain language." *Bryant v.*

*Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) (citing *Consumer Product Safety*

*Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980)). By its unambiguous terms, SLUSA

preempts all class actions "based upon the statutory or common law of any State" alleging claims

based upon a "misrepresentation or omission of material fact in connection with the purchase or

sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). The statute itself does not restrict

SLUSA's application to actions for intentional fraud or actions that otherwise plead scienter.

*See id.* Rather, SLUSA preempts class actions based on state law that allege a

6

"misrepresentation or omission of material fact" in connection with the purchase or sale of a security. *See id.* It does not matter whether such claims are pled under the rubric of fraud or negligence – all class actions that allege a "misrepresentation" upon which the plaintiffs relied in selling their shares are preempted by the statute, irrespective of whether those claims include a scienter component. *See id.*

Indeed, courts have specifically applied SLUSA to preempt claims that include both negligence and negligent misrepresentation. *See Lasley v. New England Variable Life Ins. Co.*, 126 F. Supp. 2d 1236 (N.D. Cal. 1999) (applying SLUSA to preempt claims for negligent misrepresentation and negligence, *inter alia*, in addition to fraud); *Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc.,* 2000 WL 1672324, No. 96 Civ. 5102(WK) (S.D.N.Y. Nov. 6, 2000) (citing SLUSA in dismissing common law claims of negligent misrepresentation). Other courts have applied SLUSA to dismiss a host of other state law claims without a scienter component. *See Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp. 2d 229 (D. N. J. 2000) (holding in removed action that SLUSA preempts claims against "market maker" for breach of contract, violation of the covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment and violation of the New Jersey Consumer Fraud Act); *Hines v. ESC Strategic Funds, Inc.*, 1999 WL 1705503, No. 3:99-0530 (M.D. Tenn. Sept. 17, 1999) (dismissing removed action alleging state law fraud, common law fraud, and breach of implied contract claim under SLUSA). As evidenced by the holdings in the above-cited cases, the statute on its face applies to any "misrepresentation" – it does not require an intentional misrepresentation or misrepresentation with scienter.

7

Turning to the two district court opinions upon which plaintiff relies, *Burns* held that SLUSA did not preempt claims based on breach of contract, breach of fiduciary duty, conversion, and negligent supervision, while *Green* held that SLUSA did not preempt claims based on breach of contract; neither considered claims alleging reliance on a misrepresentation, as presented here.[5] *See Burns,* 116 F. Supp. 2d at 918-19, 925-26; *Green,* 120 F. Supp. 2d at 797, 799. By contrast, plaintiff's claims depend upon the assertion of trading losses suffered in response to a misrepresentation. (*See* Compl. at ¶¶ 1, 9, 12-13, 16-17, 22-25, 27-29.) In plaintiff's own words, plaintiff represents a class of Emulex investors who "sold their shares of stock in Emulex in reliance upon the false press release issued and/or disseminated by or on behalf of Defendants." (*Id.* at ¶ 13.) Because all claims for "misrepresentation" under Alabama law are deemed a subspecies of legal fraud,[6] plaintiff in effect states only claims for misrepresentation and fraud. Thus, plaintiff's "Negligence" claim is really only cognizable as an action to recover for alleged injuries suffered as a result of a misrepresentation. Such state law claims cannot be the basis of a securities class action under the plain language of SLUSA.[7] *See*

---

[5]  To the extent *Burns* and *Green* hold that SLUSA applies only to state law claims that include a scienter component, the court finds them unpersuasive.

[6]  Section 6-5-101 of the Alabama Code states: "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."

[7]  Because this Motion may be resolved by reference to the plain language of the statute, the court need not consider the legislative history behind SLUSA's adoption. It is worth noting, however, that while SLUSA's legislative history does not define "misrepresentation," it does reveal Congress' intent to establish "uniform national rules for securities class action litigation involving our national capital markets," to prevent plaintiffs from "seeking to evade the protections that Federal law provides against abusive litigation." H.R. No. 105-640, at 8-9 (July 21, 1998). Accordingly, Congress sought to prevent state law securities class actions from avoiding the more stringent pleading requirements of federal claims. If plaintiff's theory of a scienter pleading standard for preempted claims were adopted, it would mean that class plaintiffs

*Prager*, 124 F. Supp. 2d at 230, 235 (finding that plaintiff's claims for breach of contract, breach of fiduciary duty, breach of implied covenant of good faith, unjust enrichment were, in essence securities fraud claims inasmuch as "allegations of [defendant's] pattern and practice of misrepresentation and intent to deceive, manipulate or defraud pervade the complaint and are incorporated by reference in each cause of action," and, thus, were preempted by SLUSA: "'Plaintiff's characterization of his claims are not at issue. *The issue, rather, is the substance of the claims contained in the complaint, not the particular semblance in which it is cloaked.*'" (emphasis added) (quoting *Abada v. Charles Schwab & Co.*, 68 F. Supp. 2d 1160, 1166 (S. D. Cal. 1999)).

Accordingly, plaintiff's class action falls squarely within the ambit of actions preempted by SLUSA. Thus, the court is of the opinion that plaintiff's suit cannot be maintained as a class action under SLUSA, and Internet Wire's Motion to Dismiss is due to be granted.

## D.     The Communications Decency Act

Even if plaintiff's class action was not preempted by SLUSA, plaintiff would not be able to maintain his claims as an individual because they are preempted by the Communications Decency Act of 1996, 47 U.S.C. § 230 (the "CDA"). The CDA was passed to protect "interactive computer services" that disseminate information on the Internet, from being held liable as the "publishers or speakers" of information that they disseminate but that is authored by a third party. *See* 47 U.S.C. § 230(a)-(c). To effectuate this purpose, the CDA provides: "No

---

could avoid SLUSA preemption simply by pleading claims without a "scienter" requirement (such as negligent misrepresentation) in lieu of fraud, but aimed at the same conduct. This would thwart the purpose of the statute: Congress' efforts to ensure that securities class actions were brought under *higher* pleading standards could be circumvented by enterprising plaintiffs who opted to plead state law claims with *lesser* pleading requirements.

9

provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' 47 U.S.C. § 230(c)(1); *see also* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.")

### 1.     *"Interactive Computer Service"*

The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). Congress expressly declared that its purpose in adopting the CDA was to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

Plaintiff argues that the CDA does not apply to Internet Wire, but only to Internet services providers ("ISP's") such as America Online ("AOL"). (*See* Pl.'s Resp. to Internet Wire at 7.) Plaintiff's contention is inconsistent with the express language of the statute. To be eligible for protection under the CDA, a defendant must be a "provider or user of an interactive computer service." *See* 47 U.S.C. §§ 230(c)(1), 230(f)(2). In both the Complaint and his Response brief, plaintiff admits that Internet Wire is an Internet-based news service that receives news releases from other entities (in this case, via e-mail) and then disseminates the "press releases via the electronic superhighway commonly referred to as the Internet." (Compl. at ¶¶ 10-11; Pl.'s Resp. to Internet Wire at 10.) Thus, by the plain language of the statute, and plaintiff's own characterization of Internet Wire's business, Internet Wire is an "interactive computer service" eligible for CDA protection.

Indeed, the Congressional purpose as stated in the statute itself, reflects that Congress intended the CDA to have a broad application. *See* 47 U.S.C. §§ 230(a), (b). Nothing in the plain language of the CDA, or in any of the cases interpreting the CDA, has limited its defenses to ISP's. That most of the early cases applying the CDA did so in the context of suits arising against ISP's does not limit the broad scope of immunity created by Congress. Rather, by its own terms, and as applied by the courts, the CDA exists to protect a broad range of Internet-based businesses from suit for transmitting content they did not author.[8]  The court concludes that Internet Wire qualifies as a "provider or user of an interactive computer service" under the CDA.

### 2.        *"Publisher Or Speaker"*

Section 230 of the CDA expressly protects interactive computer services from claims based on the fact that the defendant disseminated information over the Internet, even though the defendant did not author the information. *See e.g., Ben Ezra, Weinstein and Co., Inc. v. America Online, Inc.*, 206 F.3d 980, 985-86 (10th Cir. 2000) (dismissing action against AOL for posting erroneous stock prices and information on its website); *Zeran v. America Online, Inc.,* 129 F.3d 327, 330-34, 335 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998) (affirming dismissal under the CDA of claims against AOL for defamatory "hoax" authored by third party and posted on AOL's website); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-53 (D. D.C. 1998) (holding that the CDA barred action against AOL for gossip column on its website written by a third party);

---

[8]  Support for a broad application of the label "interactive computer service" can be found in the recent California case, *Stoner v. eBay Inc.*, 56 U.S.P.Q. 2d 1852, 2000 WL 1705637, No. 305666 (Cal. Super. Nov. 1, 2000), in which eBay (an Internet-based auction website which is not an ISP) was deemed entitled to protection under the CDA.  While the parties in *Stoner* agreed that eBay qualified as an "interactive computer service," the court's application of the statute to a non-ISP is nevertheless reflective of the statutory language.

11

*Stoner*, 56 U.S.P.Q. 2d 1852, 2000 WL 1705637 (applying the CDA to bar suit against eBay based on the posting and sale of contraband products by third parties on eBay's website).

The court finds the *Ben Ezra* case particularly persuasive. In that case, the Tenth Circuit Court of Appeals applied the CDA to dismiss an action against AOL alleging that AOL had, on multiple occasions, posted incorrect information regarding plaintiff's stock price and trading volume on its website. *See Ben Ezra*, 206 F.3d at 986. The court absolved the defendant of liability because the allegedly incorrect information posted on the "Quotes and Portfolios" area of defendant's website had been supplied by a third party, S & P Comstock, Inc., a financial service which provides stock quotes. *See id.* The court noted that the CDA "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party," *id.* at 984-85, and concluded that "imposing liability on Defendant [AOL] for the allegedly inaccurate stock information provided by ComStock would 'treat' Defendant as the 'publisher or speaker,' a result § 230 specifically proscribes," *id.* at 986. Therefore, the court found that AOL was immune from suit and the district court's grant of summary judgment was proper.

Plaintiff disputes that his claims seek to impose liability on Internet Wire based on its role in "issuing and/or distributing," *i.e.,* publishing and/or speaking, the Emulex Press Release. (Pl.'s Resp. to Internet Wire at 7-8.) Plaintiff argues that "it is not the words of the false news story that bring about the action, but the failure of Internet Wire to verify the report's origination and/or accuracy." (*Id.*) The court does not find this argument persuasive. Setting aside the merits of plaintiff's claims as to Internet Wire's "duty" to "verify the report's origination and/or accuracy," it is nonetheless clear that plaintiff's claims, and his alleged damages, depend upon

12

Internet Wire's *dissemination* of the Emulex Press Release.  Plaintiff openly acknowledges that the Emulex Press Release was apparently authored by a non-party individual, and not Internet Wire.  (*See* Pl.'s Resp. to Internet Wire at 8, 10.)  Thus, at the very least, plaintiff seeks to hold Internet Wire liable for information that was authored by a third party, and merely "issued and/or distributed" by Internet Wire over the Internet.  The court, however, is of the opinion that plaintiff's claims trigger the CDA's broad immunities, and plaintiff's individual claims are barred as a matter of law.

Second, plaintiff argues that the "information that leads to the damage is not the words of the report, but, rather, the assertion that it emanated directly from Emulex," and "Internet Wire was not passive in the way it processed the false press release."  (Pl.'s Resp. to Internet Wire at 8.)  This is a factual distinction without legal significance.  Plaintiff's attempt to hold Internet Wire liable for allegedly negligently attributing the press release to Emulex is simply another way of attempting to hold Internet Wire liable as the "publisher or speaker" of the Press Release authored by Jakob, and such attempt is not permissible under the CDA.

Third, plaintiff argues that Internet Wire is not entitled to protection under the CDA as a "publisher or speaker" because Internet Wire could have been "partially" involved in the "development of the information."  (Pl.'s Resp. to Internet Wire at 8.)  However, the CDA creates a broad immunity for liability, an immunity which is not forfeited even "where the interactive service provider has an active, even aggressive role in making available content prepared by others."  *Blumenthal*, 992 F. Supp. at 52 (finding AOL was immune from liability for statements in editorial column written by Drudge and posted on AOL website, despite fact

that AOL paid Drudge to write the column and retained the right to edit the column for content).
Thus, this argument is without merit.

Finally, the court also rejects plaintiff's argument that the CDA is limited to obscenity
and defamation cases. (*See* Pl.'s Resp. to Internet Wire at 6.) There is nothing in the language
of the CDA, or in any of the recent CDA caselaw, which so limits its application.  *See e.g.,*
*Zeran*, 129 F.2d 328, 2000 WL 1705637 (CDA applies to both defamation and negligence
claims); *Stoner*, 56 U.S.P.Q. 2d at 1852 (applying CDA in the context of allegedly false
information and infringing products on eBay).  Accordingly, the court is of the opinion that
plaintiff's Complaint is preempted by the CDA, and Internet Wire's Motion to Dismiss is,
therefore, due to be granted.

**E.      Negligence-Based Claims Are Barred As a Matter of Public Policy**

In addition to being precluded by the CDA, the court is of the opinion that plaintiff's
individual negligence-based claims (Negligence/Gross Negligence, Wanton Conduct and
Misrepresentation) fail as a matter of public policy.[9]

In suing Internet Wire for negligence, plaintiff suggests that there exists a duty between a
news publisher and its readership.  Indeed, plaintiff's suit depends on the court determining that
Internet Wire may be sued under Alabama law by a third party reader for "failing to verify the
accuracy" of a press release that did not expressly concern that reader.  To the contrary, the court
concludes that Alabama law does not and would not impose such a duty upon news publishers.

---

[9]   Although Internet Wire moves for dismissal of plaintiff's Complaint under common law and
the First Amendment separately, (*see* Internet Wire's Br. at 8-16), because of the similarity of
the arguments, the court will discuss both under the heading of "public policy."

Such conclusion is consistent with the decisions reached by Alabama's sister states under both common law and the First Amendment.

The issue of whether a news publisher may be held liable to a reader for false, non-defamatory publications, while not previously considered by Alabama courts, has, as Internet Wire points out, arisen in other jurisdictions. The seminal case addressing the issue is *Jaillet v. Cashman*, 189 N.Y.S. 743 (N.Y. Sup. Ct. 1921), *aff'd*, 235 N.Y. 511 (N.Y. Ct. App. 1923). In *Jaillet*, the plaintiff sought to hold the defendant (the treasurer of Dow, Jones & Co.) liable for incorrectly reporting the effect of a United States Supreme Court decision on the taxable status of stock dividends on a stock ticker service provided to brokerages. *Id.* at 744. The plaintiff in *Jaillet* saw the erroneous report, and sold stock on the presumption that stock prices would go down, only to find that the market rose on a correct report of the decision. *Id.* The court held that the plaintiff could not maintain the action: "There is a moral obligation upon every one to say nothing that is not true, but the law does not attempt to impose liability for violation of that duty unless it constitutes a breach of contract obligation or trust, or amounts to a deceit, libel, or slander." *Id.* The court noted that, while "[t]heroetically a different rule might be logically adopted," as a "matter of practical expediency such a doctrine seems absolutely necessary" in order to avoid exposing a news organization to potentially limitless liability to third parties. *Id.*

The *Jaillet* doctrine has since been affirmed in a host of other courts and jurisdictions. *See e.g., First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 176, 179-80 (2d Cir. 1989) (publisher was not liable under Florida law for investment losses that were made in reliance on incorrect information published in financial newsletter); *Daniel v. Dow Jones &*

*Co.*, 520 N.Y.S. 2d 334 (N.Y. Civ. Ct. 1987) (Dow Jones News/Retrieval computer news service could not be held liable for negligent misrepresentation).[10]

The principle behind *Jaillet* has also found support in a number of cases in which courts have dismissed claims against publishers based on non-defamatory false publications under the First Amendment to the United States Constitution. *See e.g., Blatty v. New York Times Co.*, 728 P. 2d 1177, 1182 (1987) (the First Amendment protects news organizations from non-defamatory claims whose "gravamen is the alleged injurious falsehood of a statement"), *cert. denied*, 485 U.S. 934 (1988); *Daniel*, 520 N.Y.S. at 339-40 (applying First Amendment to dismiss negligence action against computerized news wire service for publishing false news report); *Gutter v. Dow Jones, Inc.*, 490 N.E. 2d 898, 899-901, 902 (Ohio 1986) (dismissing negligence action against newspaper for negligent and inaccurate report relied upon by investor); *Tumminelo v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156, 1159 (D. N.J. 1978) ("The Court notes in passing that New Jersey could not, consistent with the requirements of the First Amendment, impose liability for a negligently untruthful news story."). The conclusion reached by nearly every court that has considered the issue of a news publisher's liability for damages for a non-defamatory publication, whether following *Jaillet* or applying the First Amendment, has been summarized by one commentator as follows:

> Public policy and constitutional constraints tilt decidedly in favor of protecting newspapers from liability for merely negligent misstatements of fact. Imposing

---

[10]  *See also Yuhas v. Mudge*, 322 A. 2d 824, 825 (N. J. Super. Ct. App. Div. 1974) (publisher not liable for injuries from advertised product); *MacKown v. Illinois Publishing & Printing Co.*, 6 N.E. 2d 526, 529 (Ill. App. Ct. 1937) (applying the *Jaillet* rule and holding that the defendant newspaper was not liable for injuries to reader from recommended dandruff remedy); *Ultramares Corp. v. Touche*, 174 N.E. 441, 446-48 (N.Y. Ct. App. 1931) (noting that the *Jaillet* rule had been applied to stock tickers and newspapers, and, thus applying the *Jaillet* rule to a certificate of credit performed by accountants).

liability in such cases could have a chilling effect on the press which would be unacceptable under the United States Constitution, and would in effect extend liability to all the world and not just a limited class.

58 Am. Jr. 2d, *Newspapers, Periodicals and Press Ass'ns*, § 10 (1989).[11]

The court concludes that Internet Wire, a publisher of corporate press releases, may not be held liable to plaintiff, an investor who simply relied on a press release published by Internet Wire in making an investment decision.[12] Accordingly, plaintiff's claims for Negligence/Gross Negligence, Wanton Conduct, and Misrepresentation, that is, each claim that does not expressly allege *intent* on the part of Internet Wire, fail as a matter of law. Therefore, Internet Wire's Motion to Dismiss is due to be dismissed on this basis as well.

---

[11]  Such a holding is consistent with a line of cases under Alabama law beginning with *Speigner v. Howard,* 502 So. 2d 367 (Ala. 1987). In *Speigner,* the Supreme Court of Alabama set forth a general common law rule that defendants may not be held liable for misrepresentation in circumstances in which the defendant is a "mere conduit" through which false information is relayed by one person to another, absent a showing of bad faith. *See Speigner,* 502 So. 2d at 371 ("neither [defendant] can be held liable in fraud for merely conveying the statements of their principal, . . . there being no evidence of bad faith on [defendant's] part"); *Miller v. Sexton,* 549 So. 2d 10, 12 (Ala. 1989) (defendant not liable on negligence claim for failure to seek verification of information, as "[i]t is apparent that [defendant] acted as a mere conduit though which information was supplied . . . and . . . [defendant] cannot be held liable for fraud or for negligence, there being no evidence of bad faith on her part."); *Fisher v. Comer Plantation, Inc.,* 772 So. 2d 455, 463-64 (Ala. 2000) (holding defendants not liable for misrepresenting value of property because "those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith"). It is clear from plaintiff's allegations that Internet Wire was a "mere conduit" of the information provided by Jakob.

[12]  Internet Wire also argues that it is entitled to at least as much protection from suit as that extended under Alabama law to a professional information provider, such as an accountant, and that plaintiff's suit is accordingly barred inasmuch as plaintiff does not allege that Internet Wire "intended to influence" a "particular transaction." *See Boykin v. Arthur Andersen & Co.,* 639 So. 2d 504, 509-10 (Ala. 1994); Section 552, Restatement of Torts (2d) (1977). Because the court concludes that dismissal is appropriate on other grounds, it will not reach this argument.

### III.   DISCUSSION OF COMTEX'S MOTION TO DISMISS[13]

**A.   Personal Jurisdiction**

As a preliminary matter, Comtex moves to dismiss plaintiff's Complaint for lack of

personal jurisdiction. The court concludes that it lacks personal jurisdiction over Comtex under

Rule 12(b)(2), and, therefore, plaintiff's claims against Comtex are due to be dismissed.

A plaintiff must allege facts, which are assumed to be true, sufficient to establish a prima

facie case of personal jurisdiction over nonresident defendants. *See Robinson v. Giamarco &*

*Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996). Alabama's long arm jurisdiction statute extends to

the full limits of federal due process. *See* Ala. R. Civ. P. 4.2(a)(2)(I); *Butler v. Beer Across*

*America*, 83 F. Supp. 2d 1261, 1266 (N. D. Ala. 2000). Due process permits the exercise of

personal jurisdiction over a nonresident defendant if: (1) the defendant has purposefully availed

himself of the benefits and protections of the forum state by establishing minimum contacts with

the state; and (2) the exercise of personal jurisdiction over the defendant does not offend

traditional notions of fair play and substantial justice. *See Burger King Corp. v. Rudzewicz,* 471

U.S. 462, 471-78 (1985); *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316

(1945).

Comtex argues that it has no physical presence in Alabama, does a *de minimis* level of

business in Alabama, never contacted plaintiff, never passed information to plaintiff, and does

not maintain a contractual relationship with plaintiff. (Comtex Mot. at 2.) Comtex also argues

---

[13]   Comtex's Motion to Dismiss initially addressed plaintiff's first Amended Complaint. One of
the initial bases for Comtex's Motion was failure to plead fraud with particularity, pursuant to
Rule 9(b). (Defendant Comtex News Network, Inc.'s Motion to Dismiss ("Comtex Mot.") at 6-
7.) Because plaintiff replead his fraud allegations in his Second Amended Complaint, plaintiff
argues that this basis for dismissal has been mooted, and Comtex does not dispute this
contention.

that its only relationship with Alabama is Comtex's Internet website, which is accessible by Internet users in Alabama. (*Id.*) Plaintiff does not dispute this; rather plaintiff argues that personal jurisdiction over Comtex is appropriate because plaintiff's Alabama broker works for a brokerage firm, Merrill Lynch, which is a client of Comtex, and because plaintiff sold his Emulex shares after the Emulex Press Release was distributed through the website of another Comtex client, Raging Bull, Inc. (Response to Comtex Motion to Dismiss ("Pl.'s Resp. to Comtex") at 2-3.) Plaintiff further argues that Comtex has sufficient contacts because (1) "Comtex receives news stories from a variety of information publishers, some of which maintain offices in Alabama such as the Associated Press," (2) Comtex "uses advance technology to target just the information needed by decision makers in business and financial markets," (3) "Comtex's list of representative clients include a variety of media and investment companies that have a presence in Alabama, such as CBS, H & R Block, Bloomberg L.P., Merrill Lynch, Price Waterhouse Coopers, and others, some of which may actually be incorporated in Alabama, such as the Exchange Corporation," and (4) "[a]ccording to Comtex's own corporate information published on its Internet web site . . . , Comtex is a 'full service, business to business infomediary [that] . . . gathers nearly 20,000 stories a day from over 10,000 diverse global sources to create its subject specific, value-added headline and vertical-market news product for distribution to over 750 companies throughout the world, reaching millions of end users.'" (*Id.* at 2.) The court is unpersuaded that such contacts are sufficient for the court to assert personal jurisdiction over Comtex.

The *Butler* court adopted a "sliding scale" standard for personal jurisdiction in Internet cases,

such that personal jurisdiction will be exercised only when real, tangible contacts to the forum

state exist. *Butler*, 83 F. Supp. 2d at 1268. Specifically, the court stated:

> The fact that many companies have established virtual beachheads on the Internet
> and the fact that the Internet is now accessible from almost any point on the globe
> have created complex, new considerations in counting minimum contacts for
> purposes of determining personal jurisdiction. Recently, the Fifth Circuit adopted
> the carefully considered opinion of *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.
> Supp. 1119 (W.D. Pa. 1997), for analyzing Internet contacts. . . . Under *Zippo*, . . .
> jurisdiction is proper when the defendant clearly does business over the Internet
> by entering into contracts with residents of other states which involve the
> knowing and repeated transmission of computer files over the Internet. . . . In
> personam jurisdiction is improper, however, when the nonresident defendant has
> established a passive Internet site, which acts as little more than an electronic
> billboard for the posting of information. . . . Between those two extremes lies a
> gray area where a defendant has a website that allows a user to exchange
> information with a host computer; there, the determination turns on the nature of
> the information transmitted and on the degree of interaction.

*Id.* at 1267-68. The *Butler* court found that actual sales through the defendant's website into the

forum state were insufficient to establish personal jurisdiction. *See id.* at 1263, 1268. The

allegations in plaintiff's Complaint merely allege an attenuated relationship between the

purported plaintiffs in the class action and Comtex. (*See* Compl. at ¶¶ 6-8, 10-13.) Plaintiff

noticeably does not allege that he has ever accessed the Comtex website in Alabama, prior to this

action, or that he learned of the Emulex Press Release directly from Comtex's website. Further,

plaintiff has not alleged any actual sale or transaction by Comtex in Alabama. The court

concludes that Comtex has not purposefully availed itself of the privilege of doing business in

Alabama, so as to expect to be haled into court here.

The court is of the opinion that plaintiff has not established that Comtex has minimum

contacts with Alabama, and that the exercise of jurisdiction over Comtex would offend

20

traditional notions of fair play and substantial justice. Thus, Comtex's Motion to Dismiss plaintiff's Complaint is due to be granted.

## B.    Comtex's Joinder In Internet Wire's Motion

By a separately filed Motion, dated February 22, 2001, Comtex joined in Internet Wire's Motion to Dismiss, in which Comtex adopted all of the arguments presented by Internet Wire, with the exception of Internet Wire's CDA argument.[14] (*See* Mot to Conform.) Although the court does not reach the merits of either Comtex's Motion to Dismiss under Rule 12(b)(6), or of its joinder with Internet Wire's Motion because it lacks personal jurisdiction over Comtex, the court notes that had plaintiff established personal jurisdiction over Comtex, plaintiff's class action would be due to be dismissed under SLUSA, and his individual claims would be due to be dismissed as a matter of public policy, for the reasons set forth above.

## IV.   CONCLUSION

For the foregoing reasons, the court is of the opinion that Defendant Comtex News Network, Inc.'s Motion to Dismiss and Defendant Internet Wire, Inc.'s Motion to Dismiss are due to be granted. Plaintiff's Second Amended Complaint, and each cause of action contained

---

[14] Comtex does not contend that it qualifies as an ISP. (*See* Motion by Defendant Comtex News Network, Inc. to Adopt and Conform Arguments of Co-Defendant Internet Wire ("Mot. to Conform") at ¶ 4.)

21

therein, is therefore due to be dismissed with prejudice.  An Orde⁻ in accordance with this

Memorandum Opinion will be entered contemporaneously herew th.

     **DONE** this  Sth  day of July, 2001.

**SHARON LOVELACE BLACKBURN**
United States District Judge